# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Minn-Dak Farmers Cooperative,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Industrial & Environmental Concepts, Inc.,<br><br>　　　　Defendant. | Case No. _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Minn-Dak Farmers Cooperative ("MDFC"), for its Complaint against defendant Industrial & Environmental Concepts, Inc. ("IEC"), states and alleges as follows:

## INTRODUCTION

1. MDFC contracted with IEC to supply and install a high density polyethylene ("HDPE") liner and cover for a wastewater pond at MDFC's sugarbeet processing facility in Wahpeton, North Dakota. After IEC installed the liner and during its installation of the cover—which IEC chose to install from east to west, into the prevailing wind—the cover was blown from where IEC had left it on the night of June 8, 2020, back to the eastern edge of the pond, causing extensive damage to both the cover and the liner. Because this damage would not have occurred but for IEC's breaches of contract, breaches of warranty, and negligence, MDFC brings this action to recover the more than $1 million it incurred in repairing the damage.

## PARTIES

2. MDFC is a North Dakota cooperative association formed under North Dakota Century Code ch. 10-15 with its principal place of business in Wahpeton, North Dakota. Formed in 1972, MDFC is owned by approximately five hundred Red River Valley

sugarbeet shareholder/growers who, collectively, annually grow approximately 105,000 acres of sugarbeets.

3. IEC is a Minnesota corporation with its principal place of business in Lakeville, Minnesota. On its website, IEC claims it is "widely recognized as the worldwide leader in the design, fabrication, and installation of cover and liner systems," that its "full time staff of certified designers, fabricators, and installers ensures the highest quality products and services," and that it "possesses the expertise and commitment required to successfully complete any size project." *See* https://www.ieccovers.com/about-us/ (last visited Nov. 19, 2021).

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between the parties and, as set forth in this Complaint, the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has personal jurisdiction over IEC pursuant to Fed. R. Civ. P. 4(k)(1) and N.D.R.Civ.P. 4(b)(2).

6. Pursuant to 28 U.S.C. § 1391(b)(2) and D.N.D. Gen. L.R. 1.1, this Action is properly venued in this Court because "a substantial part of the events or omissions" giving rise to MDFC's claims "occurred" in Richland County, North Dakota.

## FACTUAL BACKGROUND

7. Sugarbeets are grown conventionally in fields, then transported to MDFC's processing facility in Wahpeton. Upon arrival at the facility, a water flume conveys the sugarbeets into the facility. The water flume creates a substantial amount of wastewater

2

containing mud as well as salts and sugars from the beets. MDFC begins the treatment of this wastewater by pumping it into on-site holding ponds where the waste solids settle to the bottom before the water is pumped out for further treatment. One of those ponds is a 10.4 acre pond designed to hold 38 million gallons of wastewater known as "Pond 3."

8. In July 2018, MDFC discovered that the existing HDPE liner in Pond 3 was leaking. MDFC subsequently determined that the liner needed to be replaced. In connection with that replacement, MDFC decided to add an insulated HDPE cover which would float on the surface of the pond and be extrusion-welded to the liner to create a gas-tight system for biogas collection, thereby mitigating the odors emanating from the pond.

9. By MDFC Purchase Order 0043338 dated April 10, 2019, MDFC contracted with IEC to supply and install the cover on Pond 3. A copy of that Purchase Order, as subsequently amended and in the amount of $1,583,075.68, is attached hereto as **Exhibit A**. By MDFC Purchase Order 0043570 dated April 26, 2019, MDFC contracted with IEC to supply and install the replacement liner in Pond 3. A copy of that Purchase Order, as subsequently amended and in the amount of $775,135.87, is attached hereto as **Exhibit B**. Both Purchase Orders were expressly made subject to MDFC's General Terms and Conditions (the "Terms and Conditions") attached thereto.

10. Paragraph 5(b) of the Terms and Conditions states:

> Contractor represents and warrants that the Deliverables [*i.e.*, all goods and services provided by Contractor] (in whole and in part) shall: (1) be free from material Deficiencies; and (2) meet, conform to and operate in accordance with all specifications and in accordance with this Agreement. Contractor shall, at its expense, repair, correct or replace any Deliverable that contains or experiences material Deficiencies or fails to meet, conform to or operate in accordance with specifications within seven (7) days of receiving notice of such Deficiencies or failures from the Company or within such

other period as the Company specifies in the notice. In the event Contractor is unable to repair, correct or replace such Deliverable to the Company's satisfaction, Contractor shall refund the fees or other amounts paid for the Deliverables and for any services related thereto. The foregoing shall not constitute an exclusive remedy under this Agreement, and the Company shall be entitled to pursue any other available contractual, legal or equitable remedies. Contractor shall be available at all reasonable times to assist the Company with questions, problems and concerns about the Deliverables, to inform the Company promptly of any known Deficiencies in any Deliverables, repair and correct any Deliverables not performing in accordance with the warranties contained in this Agreement, notwithstanding that such Deliverable may have been accepted by the Company, and provide the Company with all necessary materials with respect to such repaired or corrected Deliverable.

11. Paragraph 5(c) of the Terms and Conditions states:

Contractor represents, warrants and covenants that all services to be performed as Deliverables under this Agreement shall be performed in a professional, competent, diligent, and workmanlike manner by knowledgeable, trained and qualified personnel, all in accordance with the terms and specifications of this Agreement and the standards of performance considered generally acceptable in the industry for similar tasks and projects. In the absence of a specification for the performance of any portion of this Agreement, the parties agree that the applicable specification shall be the generally accepted industry standard. If the Company notifies Contractor of any services performed in violation of this standard, Contractor shall re-perform the services at no cost to the Company, such that the services are rendered in the above-specified manner, or if Contractor is unable to perform the services as warranted, Contractor shall reimburse the Company any fees or compensation paid to Contractor for the unsatisfactory services.

12. Paragraph 7(a) of the Terms and Conditions states, in part:

Contractor agrees to indemnify, defend and save the Company and its officers, directors, employees and agents (the "Indemnified Parties") harmless from and against any and all costs, expenses, losses, claims, damages, liabilities, settlements and judgments (including, without limitation, the reasonable value of the time spent by inhouse counsel or legal staff, and the costs, expenses and attorneys' fees of other

4

> counsel retained by the Indemnified Parties) or actions in respect thereof (collectively, "Losses") directly or indirectly related to, resulting from, or arising out of this Agreement, including but not limited to any Losses related to, resulting from, or arising out of: (1) any breach of this Agreement by Contractor, including any breach of any warranty given by Contractor; (2) any negligent, intentional or wrongful act or omission of Contractor or any agent or approved subcontractor utilized or employed by Contractor; (3) Contractor's performance, attempted performance or non-performance of this Agreement or the sale, performance or delivery of any Deliverable, including relating to (A) any agent or approved subcontractor utilized or employed by Contractor or (B) the receipt, custody or use by Contractor of any tools, equipment, improvements or property of the Company or employees of the Company . . . .

13. In late summer 2019, after Pond 3 had been drained and the existing sludge and liner removed, IEC proceeded to install the liner. IEC completed installation of the liner on or about November 15, 2019, and on or about November 27, 2019, MDFC received approval from the State of North Dakota to begin re-filling Pond 3. Given the time of year, MDFC and IEC agreed that IEC would not install the cover until 2020.

14. In 2020, IEC proceeded with the installation of the cover. The installation of such a floating cover is generally accomplished panel-by-panel using a floating barge system, starting on one end of the pond and then moving to the other, with the crew working on the barge to fusion-weld the next panels onto the prior panels to form the cover extending across the pond.

15. IEC chose to install the cover from the eastern edge of the pond to the western edge.

16. By the evening of June 8, 2020 when the IEC crew left the site for the day, the cover extended approximately one-quarter of the way from east to west across the pond.

17. Sometime before 6:00 a.m. the next morning, strong but regionally typical winds—winds that had been predicted by the NOAA/NWS Storm Prediction Center—caught the leading western edge of the partially installed cover, lifted it up, and blew it back to the eastern edge of the pond, causing extensive damage to both the cover and the liner.

18. The damage to the liner also resulted in the contents of the pond leaking underneath the liner.

19. This damage was a direct result of IEC's failure to follow typical industry standards during its installation of the cover.

20. For example, IEC installed the cover <u>into</u> the prevailing winds, rather than <u>with</u> the prevailing winds; that is, IEC installed the cover from the eastern edge of the pond working west across the surface of the pond into the prevailing North Dakota westerly winds. This exposed the leading edge of the cover to the prevailing winds, allowing the winds to lift the cover up and blow it back to the eastern edge of the pond.

21. IEC also failed to adequately protect the leading edge from such uplift. Although IEC used sand tubes to weigh the leading edge down, it did not sufficiently account for the forecasted winds.

22. IEC also welded the sides of the cover to the liner as the installation progressed, rather than waiting to do so until the cover was fully installed across the surface of the pond. As a result, as the winds lifted the cover, the cover pulled the liner up with it and eventually the liner tore, causing it to leak. Had the cover not been prematurely welded to the liner, even if the cover had been blown off, there would likely have been little or no damage to the liner or to the pond itself.

23. Although IEC or its insurer paid to replace the cover, despite repeated demands by MDFC, they have refused to pay for the repair of the liner or the pond, forcing MDFC to spend in excess of $1 million to do so itself.

## COUNT I
## BREACH OF CONTRACT

24. MDFC realleges and incorporates the preceding paragraphs as if fully stated herein.

25. A valid, enforceable contract exists between MDFC and IEC.

26. IEC breached that contract for the reasons previously set forth herein.

27. IEC's breaches have damaged MDFC in an amount in excess of $1 million.

## COUNT II
## BREACH OF WARRANTY

28. MDFC realleges and incorporates the preceding paragraphs as if fully stated herein.

29. IEC expressly warranted, among other things, that its services would meet, conform to, and operate in accordance with the specifications and its contract and that all services performed by it would be done in a professional, competent, diligent and workmanlike manner and in accordance with the standards of performance as per the industry standard.

30. IEC is liable for breach of these express warranties for the reasons previously set forth herein.

31. IEC's breaches of its express warranties have damaged MDFC in an amount in excess of $1 million.

## COUNT III
## NEGLIGENCE

32. MDFC realleges and incorporates the preceding paragraphs as if fully stated

herein.

33. IEC, in constructing the liner and cover for MDFC, owed MDFC a duty of ordinary care.

34. IEC failed to conform to the standard of conduct required by its duty of ordinary care.

35. IEC's breaches of its duty in regard to the installation of the liner and cover proximately caused MDFC's injuries.

36. IEC's breaches of duty damaged MDFC in an amount in excess of $1 million.

## DEMAND FOR A JURY TRIAL

37. MDFC demands a jury trial for all claims alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, MDFC prays for the following relief:

A. Judgment against IEC in an amount to be determined at trial in excess of $1 million, plus interest, attorney's fees, and costs; and

B. Such other relief as the Court may deem just, necessary and appropriate.

Dated: December 16, 2021                **BALLARD SPAHR LLP**

By: *s/ Jonathan M. Bye*
Jonathan M. Bye (MN #148830)
byej@ballardspahr.com
Conor H.M. Smith (ND #08718)
smithchm@ballardspahr.com
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211

**Attorneys for Plaintiff**